IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JMS MANUFACTURING, LLC, trading and doing business as RIDGWAY POWDERED METALS,<br>         Plaintiff,<br><br>         v.<br><br>MICHAEL DEPONCEAU, et al.,<br>         Defendants. | )<br>)<br>) C.A. No. 25-14 Erie<br>)<br>)<br>) District Judge Susan Paradise Baxter<br>)<br>)<br>) |

**MEMORANDUM OPINION**
**WITH FINDINGS OF FACT AND CONCLUSIONS OF LAW**

**I.    Procedural History**

Plaintiff JMS Manufacturing, LLC, trading and doing business as Ridgway Powdered Metals ("RPM"), initiated this civil action on January 20, 2025, by filing a complaint against Defendants Michael DePonceau, Hamid Alattas, and Falls Creek Powdered Metals, Inc. ("Falls Creek"). [ECF No. 1]. The complaint asserts multiple claims arising from Defendants' alleged misappropriation of RPM's confidential and proprietary information: Count I – violation of the Federal Defend Trade Secrets Act, 18 U.S.C. §1831, *et seq.*; Count II – violation of Pennsylvania's Uniform Trade Secrets Act, 12 Pa.C.S. §5301, *et seq.*; Count III –  violation of the Federal Computer Fraud and Abuse Act, 18 U.S.C.S. §1030(g); Count IV – Conversion; Count V – Replevin; Count VI – Tortious Interference with Business Relations; Count VII – Civil Conspiracy; and Count VIII – Claim for an Accounting. As relief for its claims, RPM seeks, *inter alia*, monetary damages and permanent injunctive relief.

Presently pending before the Court is RPM's motion for preliminary injunction [ECF No. 4], which seeks to enjoin Defendants from accessing and using RPM's confidential and proprietary information allegedly in their possession before the trial or final hearing and determination on the merits of RPM's request for permanent injunctive relief can occur.[1] A four-day evidentiary hearing on RPM's motion for preliminary injunction was held before this Court, on February 3, 4, 5, and 7, 2025, during which the Court heard testimony from the following witnesses: RPM's General Manager Brian Delhunty ("Delhunty"); computer forensic examiner Kurt Petro ("Petro"); RPM's owner, John Schneider ("Schneider"); Defendant Hamid Alattas ("Alattas"), owner of Falls Creek; Kelly Workman ("Workman"), purchasing manager at Weber Knapp; Steven Hagerty ("Hagerty"), Vice President of Tennessee Industrial Specialties; and Defendant Michael Deponceau ("DePonceau"), former plant manager at RPM and current employee of Falls Creek. The parties also entered a number of exhibits on the record. This matter is now ripe for disposition.

Before turning to a discussion of the merits of RPM's motion, it is necessary to set out the standards governing the Court's decision.

## II.    Standards of Review

The Court of Appeals for the Third Circuit recently reiterated the standards to be used in resolving motions for preliminary injunction: "[a] court weighing a preliminary injunction must consider four guideposts: (1) the movants' likelihood of success on the merits; (2) the risk that the movants will suffer irreparable harm absent preliminary relief; (3) the balance of equities; and (4) the public interest." Boynes v. Limetree Bay Ventures LLC, 110 F.4th 604, 610 (3d Cir.

---

[1] By Order dated January 24, 2025, the Court previously granted RPM's separate motion for temporary restraining order [ECF No. 3] to preserve the status quo between the parties until February 3, 2025. [ECF No. 8]. This temporary restraining order has not been extended by the Court and is now expired.

2024). Of these factors, the first two factors are the "most critical." Nken v. Holder, 556 U.S. 418, 434 (2009). If the first two are present, only then should a court consider the remaining factors. *Id*. at 435.

When deciding a request for injunctive relief, a district court assumes the dual role of both factfinder and legal adjudicator. Doe v. Pine-Richland Sch. Dist., 2024 WL 2058437, at *1 (W.D. Pa. May 7, 2024). Consequently, the court is required to make "findings of fact and conclusions of law upon the granting or refusing of a preliminary injunction." Bradley v. Pittsburgh Bd. of Educ., 910 F.2d 1172, 1178 (3d Cir. 1990) citing Fed. R. Civ. P. 52(a)(2). This obligation imposed by Rule 52(a)(2) remains mandatory "even when there has been no evidentiary hearing on the motion." Id. However, at the preliminary injunction stage, "procedures are less formal and evidence is less complete than in a trial on the merits." Kos Pharms., Inc. v. Andrx Corp., 369 F.3d 700, 718 (3d Cir. 2004). Additionally, the grant or denial of a preliminary injunction is typically based on a limited set of facts, necessitating a delicate balancing act by the district judge. AT&T Co. v. Winback & Conserve Program, Inc., 42 F.3d 1421, 1427 (3d Cir. 1994). Therefore, the court "may rely on affidavits and hearsay materials which would not be admissible evidence." Kos Pharms., 369 F.3d at 718, quoting Levi Strauss & Co. v. Sunrise Int'l Trading, Inc., 51 F.3d 982, 985 (11th Cir. 1995). The significance attributed to such materials will "vary greatly depending on the facts and circumstances of a given case." Id. at 719. Additionally, the court is responsible for assessing the credibility of witness testimony and may base its decision to grant or deny a preliminary injunction on these credibility determinations. See, e.g., Hudson Glob. Res. Holdings, Inc. v. Hill, 2007 WL 1545678, at *8 (W.D. Pa. May 25, 2007).

"[A] preliminary injunction is an extraordinary and drastic remedy." See Delaware State Sportsmen's Ass'n, Inc. v. Delaware Dep't of Safety & Homeland Sec., 108 F.4th 194, 202 (3d Cir. July 15, 2024) quoting Mazurek v. Armstrong, 520 U.S. 968, 972 (1997) (internal quotation marks and emphasis omitted). Issuing an injunction requires a court to exercise "great caution, deliberation, and sound discretion." Id. at 199-200 (citation omitted). "A court should not grant an injunction unless the plaintiff's right is clear, his impending injury is great, and only an injunction can avert that injury." Id. The movant bears the ultimate burden of making "a clear showing" of its entitlement to such preliminary relief. Id. at 202.

In analyzing a request for preliminary injunctive relief, there are four factors a court must consider:

> (1) The likelihood of success on the merits;
>
> (2) The risk of irreparable injury absent preliminary relief;
>
> (3) The balance of equities; and
>
> (4) The public interest.

Delaware State Sportsmen's Assoc., 108 F.4th at 202 (referring to the factors as the "four canonical guideposts"). The first two "gateway factors" are paramount. If the court is satisfied that both gateway factors have been established by the movant, it moves on to consider the two remaining factors – whether granting relief will result in even greater harm to the nonmoving party and whether the public interest favors such preliminary relief. The court will then exercise its discretion to determine whether the overall balance justifies granting preliminary relief. See Mallet and Co. Inc. v. Lacayo, 16 F.4th 364, 380 (3d Cir. 2021) quoting Reilly v. City of Harrisburg, 858 F.3d 173, 179 (3d Cir. 2017).

With these standards of review in mind, and having now considered the evidence presented by the parties, the Court makes the following Findings of Fact and Conclusions of Law denying the motion for preliminary injunction. See Federal Rule of Civil Procedure 52.

### III. Findings of Fact

1. RPM is a leading supplier of products and services in the highly competitive powdered metal parts industry, and claims ownership of certain confidential and proprietary information that it has developed during the course of its business, including, but not limited to, pricing, proposals, customer lists and information, client technical and specification information, planning data, engineering and testing data, and compilations of information, records and technical specifications that are highly important to the growth and sustainability of its business ("Confidential and Proprietary Information"). (ECF No. 4, at ¶¶ 3a, b; Delhunty testimony, 2/3/2025 hearing transcript at pp. 58-63).

2. Defendant Deponceau was formerly employed by RPM as plant manager through which he was given access to RPM's Confidential and Proprietary Information. (ECF No. 4, at ¶ 3d; Delhunty testimony, 2/3/2025 hearing transcript at pp. 64-66).

3. During the time of his employment, Defendant Deponceau was provided with and had use and possession of an office desktop computer with serial number N2VK1UE ("Desktop") and a laptop computer ("Laptop") through which he could access RPM's computer server remotely. In addition, DePonceau was provided a Seagate USB device with serial number NA411SZ2 ("Seagate device"). All of these items were owned by RPM. (ECF No. 4, at ¶ 3h).

4. On or about June 19, 2023, Defendant Deponceau terminated his employment with RPM. (Id. at ¶ 3l).

5. On June 21, 2023, Mr. Deponceau accepted a position with Defendant Falls Creek, a direct competitor of RPM's. (Alattas testimony, 2/5/2025 hearing transcript at p. 46).

6. In December 2024, RPM retained a computer forensic company, BitxBit, LLC, to perform a forensic analysis of the Desktop that was assigned to Defendant Deponceau. (Petro testimony, 2/4/2025 hearing transcript at p. 51).

7. The forensic analysis was performed by Petro, a senior forensic examiner employed by BitxBit, LLC. (Id. at p. 49).

8. Petro's forensic analysis of the Desktop discovered that the Seagate device was connected to the Desktop on multiple occasions during the two-week period leading up to Deponceau's termination of his employment with RPM on June 19, 2023. (Id. at pp. 54-55). In particular, it was determined that from June 7, 2023 to June 19, 2023, a total of 126 files and/or folders were accessed on the Seagate device, which, according to RPM, contain virtually all of RPM's Confidential and Proprietary Information. (Id. at pp. 62-63; Hearing Exhibit 25; ECF No. 4, at ¶¶ 3p, q, r).

9. Defendant DePonceau repeatedly testified that he did not use the Seagate device to download or copy files from the Desktop, did not take the device when he left RPM, and did not even know where the device was located. (DePonceau testimony, 2/7/2025 hearing transcript at pp. 53, 64, 68-69, 79).

10. Principally, RPM alleges that Defendants "utilized and are still utilizing the Confidential and Proprietary Information and other trade secrets of RPM that Deponceau had [allegedly] downloaded onto the Seagate USB device to solicit business from the customers and former customers of RPM, including the customers known as Weber Knapp, Burgaflex, ad Tennessee Industrial Specialties, Inc. ("TIS"). (ECF No. 4, at ¶ 3x).

11. According to Alattas, Falls Creek did not use any confidential information from RPM regarding the pricing, manufacture, or tooling it has provided for Weber Knapp, Burgaflex, or Tennessee. (Alattas testimony, 2/5/2025 hearing transcript at p. 54).

12. Delhunty acknowledged that tooling developed and engineered by RPM for the vast majority of its customers, like Weber Knapp and Burgaflex, was the property of the customer and may be removed by the customer and transferred to another supplier if the customer so chooses. (Delhunty testimony, 2/4/2025 hearing transcript at pp. 7, 19).

13. RPM never transferred any of the tooling owned by Weber Knapp, Burgaflex, or Tennessee to Falls Creek for the parts that were being manufactured by Falls Creek (Id. at p. 23).

14. RPM's loss of sales to Weber Knapp from 2023 to 2024 was largely attributable to business slowdown at Weber Knapp. Weber Knapp did not attribute any loss of sales to the transfer of business to Falls Creek. (Id. at pp. 37-39).

15. In September 2023, Weber Knapp, through Workman, began seeking multiple vendors for several of its parts so as not to "put all of [its] eggs in one basket."

(Workman testimony, 2/5/2025 hearing transcript at pp. 78-79). Workman contacted DePonceau directly after learning that he left RPM to see if Falls Creek could be a secondary supplier for Weber Knapp. (p. 81). Rather than transfer its tooling from RPM to Falls Creek, Weber Knapp left its tools at RPM and had Falls Creek produce its own tooling because Weber Knapp wasn't looking to replace RPM. (pp. 80-81). Weber Knapp gave Falls Creek one of its smaller lines as a test to see if it would be a good vendor. (p. 82). According to DePonceau the four parts produced by Falls Creek for Weber Knapp were "low volume" parts, meaning that they made 500 to 1,000 of each part every other month. (Deponceau testimony, 2/7/2025 hearing transcript, at pp. 11-12).

16. Falls Creek made only two parts for Burgaflex in 2023 and 2024, but no longer make parts for them (Alattas testimony, 2/5/2025 hearing transcript at pp. 30, 32).

17. Sometime after DePonceau left RPM, TIS, through Hagerty, contacted DePonceau because TIS was running low on parts. At the time Hagerty did not know that Deponceau had left RPM. (Hagerty testimony, 2/5/2025 hearing transcript at p. 95). After learning that DePonceau was still working in the powdered metals industry, Hagerty emailed him the parts he needed and asked for a quote. Hagerty also requested a quote for the same parts from RPM. (Id. at p. 96). RPM quoted a price that was considerably higher than the quote from Deponceau so he ordered the parts from Falls Creek. (Id. at p. 97).

**IV.  Conclusions of Law**

1. Preliminary injunctions are "extraordinary remed[ies] granted in limited circumstances." <u>Razor Tech., LLC v. Hendrickson</u>, 2018 WL 2063844, at *8 (E.D. Pa. May 3, 2018). <u>See</u> <u>also</u> <u>Kos Pharms., Inc. v. Andrx Corp.</u>, 369 F.3d 700, 708 (3d Cir. May 24, 2004).

2. The four-factor preliminary injunction standard requires that the moving party first demonstrate a reasonable likelihood of success on the merits and that it would likely suffer irreparable harm absent the award of an injunction. <u>ADP, LLC v. Rafferty</u>, 923 F.3d 113, 119-20 (3d Cir. Sept. 6, 2019) <u>citing</u> <u>Reilly</u>, 858 F.3d at 179.

3. If the movant makes that threshold showing, the court then must balance those two "gateway factors" against the relative hardship an injunction would inflict on the parties and the public interest. <u>Id</u>.

4. The showing of irreparable harm will be "insufficient if the harm will occur only in the indefinite future. Rather, the moving party must make a 'clear showing of immediate irreparable harm.'" <u>Washington v. Superintendent Gilmore</u>, 2019 WL 2610765, at *6 (W.D. Pa. Jun. 29, 2019) <u>quoting</u> <u>Campbell Soup Co. v. ConAgra, Inc.</u>, 977 F.2d 86, 91 (3d Cir. Oct. 13, 1992).

5. When ruling on a motion for a preliminary injunction, "a court both finds facts and determines the law." <u>See</u> Fed.R.Civ.P. 52(a)(1) & (2). In its fact-finding capacity, at an evidentiary hearing, a court may make credibility determinations as to the witnesses' testimony and the evidence presented during the hearing. <u>See</u>, e.g., <u>Hudson v. Global Resources Holdings, Inc. v. Hill</u>, 2007

WL 1545678, at *8 (W.D. Pa. May 25, 2007) ("A court considering whether to grant a preliminary injunction may assess the credibility of witnesses testifying before it at a preliminary injunction hearing and based its decisions on credibility determination.")." Berger v. Weinstein, 2008 WL at *4 (E.D. Pa. July 24, 2008).

6. RPM seeks a preliminary injunction. Accordingly, it is RPM's burden to prove a likelihood of success on its claims and that it will suffer irreparable injury if a preliminary injunction is not granted.

*Likelihood of Success on the Merits*

7. RPM seeks preliminary injunctive relief on all of its claims, with the exception of its claim for accounting at Count VIII of the complaint. Some or all of these claims require a showing, in whole or in part, that Defendant Deponceau retained possession of property belonging to RPM, i.e., the Seagate device, on which he misappropriated RPM's Confidential and Proprietary Information and/or trade secrets, and that Defendants have retained and utilized such information to solicit RPM's current, former, and/or potential customers and to gain an unfair competitive advantage in the commercial marketplace.

8. RPM has presented computer forensic evidence that convincingly demonstrates that, from June 7, 2023 to June 19, 2023, one hundred twenty-six (126) files and/or folders containing RPM's Confidential and Proprietary Information were downloaded and/or copied onto the Seagate USB device that was assigned to Defendant Deponceau; however, Defendant Deponceau has repeatedly denied under oath that he either used the Seagate device or

knows/knew of its location, and no evidence of record has been presented to prove otherwise. Moreover, RPM has failed to present sufficient evidence of record to establish that Defendants actually used any of RPM's Confidential and Proprietary Information to solicit RPM's customers or to gain an unfair competitive advantage. Nonetheless, RPM may still be able to prove its claims through evidence obtained in discovery and, thus, there remains a likelihood of success on the merits.

*Irreparable Harm*

9. The irreparable harm prong "requires courts to determine whether it is 'more likely than not [the movant will] suffer irreparable harm in the absence of preliminary relief.'" Reilly, 858 F.3d at 179.

10. To demonstrate irreparable harm, the moving party must show "immediate irreparable injury, or a presently existing actual threat." Vento v. Certain Underwriters at Lloyds, 2019 WL 2396554, at * 2 (D.V.I. Jun. 6, 2019) quoting Acierno v. New Castle Cty., 40 F.3d 645, 655 (3d Cir. Nov. 10, 1994). The harm must also be "imminent." Id. quoting Punnett v. Carter, 621 F.2d 578, 586 (3d Cir. May 13, 1980).

11. The Supreme Court has established that the movants must establish that irreparable harm is likely, not just possible, in order to obtain a preliminary injunction. Winter v. Natural Res. Defense Council, 555 U.S. 7, 21 (2008).

12. Irreparable harm is "of a peculiar nature" for which "compensation in money alone cannot atone." Id. quoting Opticians Ass'n of Am. v. Ind. Opticians of Am., 920 F.2d 187, 195 (3d Cir. Dec. 27, 1990). The injury

"cannot be purely economic," but "must pose a potential harm which cannot be redressed by a legal or equitable remedy following trial." Razor Technology, 2018 WL 2063844, at *11 (internal citations omitted). See also Reilly, 858 F.3d at n.4 ("the availability of money damages for an injury typically will preclude a finding of irreparable harm").

13. The loss of customer goodwill, business relationships, and reputation can constitute irreparable harm for purposes of preliminary injunctive relief. Kos Pharms., 369 F.3d at 726.

14. Here, the record evidence reveals that the principal customers at issue, Weber Knapp, Burgaflex, and TIS, remain customers of RPM and have left their tooling with RPM with the apparent purpose of continuing their existing business relationships with RPM. Falls Creek was merely sought as a secondary supplier for these companies.

15. Furthermore, the record evidence establishes that RPM's loss of sales in 2024 from its largest customer, Weber Knapp, was largely attributed to a business slowdown at Weber Knapp rather than the transfer of its business to Falls Creek; the loss of business with TIS was due to RPM's escalated pricing that began prior to Deponceau's departure from RPM and continued afterward; and Falls Creek only produced two parts for Burgaflex in 2023 and 2024 and no longer does work for them.

16. Based on the foregoing, there is insufficient evidence demonstrating an imminent threat of loss of goodwill, business relationships, or reputation to support a finding of immediate irreparable harm. The only harm RPM has been

       able to quantify with any degree of certainty is a loss of revenue that may or may not be attributable to the actions of Defendants and, even so, is insufficient on its own to establish irreparable harm.

17. For the foregoing reasons, RPM has not met its burden of showing immediate irreparable harm and its motion for preliminary injunction will be denied, accordingly.

An appropriate Order follows.